### SONNENBERG v. SOUTHERN PAC. CO.*

(Circuit Court of Appeals, Ninth Circuit. February 10, 1908.)

No. 1,479.

1. WRIT OF ERROR—REVIEW—DIRECTED VERDICT.

In determining whether it was proper to direct a verdict for defendant, plaintiff is entitled to the benefit of all the inferences in his favor which the jury could have been justified in drawing from the testimony.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3748.]

2. MASTER AND SERVANT—RAILROADS—INJURY TO LABORER BY CAVING BANK—SAFETY OF PLACE—QUESTION FOR JURY.

In an action against a railway company for injury to a laborer caused by the caving of a bank of an excavation, held, under the evidence, a question for the jury whether the company provided a reasonably safe place in which he was required to work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 1010–1031.]

In Error to the Circuit Court of the United States for the Northern District of California.

This is an action by the plaintiff in error to recover damages for personal injuries occasioned by the alleged negligence of the defendant in error. The court directed the jury to find a verdict for the defendant, and plaintiff assigns this direction as error.

The evidence material to be considered upon this question is substantially as follows: In the fall of 1904 a wooden culvert passing through the embankment of defendant's railroad near a point designated as the "Nacimiento Switch" in San Luis Obispo county, Cal., was burned out. In the early part of December the company determined to replace the burned out wooden culvert with a concrete arch, and R. M. Drake, assistant resident engineer, was detailed to take charge of the work. The necessary material was sent to the switch for use at the culvert. The work was commenced about the 10th or 12th of December, under charge of R. P. Edgecombe, the gang foreman in the bridge and building department. The work had been in progress 10 or 12 days when plaintiff, who was residing at San Miguel, and another laborer by the name of Braffat, residing at the same place, were informed that they could get work at the culvert. San Miguel is about six miles from the switch. The plaintiff and Braffat were taken to the culvert by a work train on December 22d, and after their arrival they were set to work by the foreman. At that time there was a cut in the embankment under the rails from 18 to 20 feet wide, and from 12 to 15 feet deep. Piles had been driven on each side of the cut to support the rails above. The plaintiff and Braffat were sent to the bottom of the culvert to shovel dirt. There is some conflict in the evidence as to the work that had been done up to this time to secure the banks of the cut, but it is not very material. There is no conflict in the evidence as to the caving of the bank which resulted in the injury to plaintiff.

---

*Rehearing denied June 10, 1908.

When the plaintiff gave his testimony in court in February, 1907, he was 23 years of age. He testified that he had never before worked in cuts or excavations or in making ditches. He was not told of any danger to be apprehended when he went to work, and he apprehended no danger. He knew nothing about that kind of work. In his testimony he refers to the piles, but he says when he entered the excavation or cut there were no timbers or supports alongside either of the embankments. There was nothing in the cut or excavation other than the piles—nothing against the side of either bank. The plaintiff afterward qualified his testimony on cross-examination by saying substantially that there were no timbers in the wall to his back.

Braffat in his testimony on behalf of the plaintiff, mentions the piles, but says there was nothing to hold up the banks.

Brunskill, another witness on behalf of the plaintiff, who was employed in the cut on December 23d, 24th, and 26th, says that on those days there were no timbers upon either side against the embankments.

The foreman, Edgecombe, testified that it was necessary to drive piling and build a temporary trestle in order to carry the trains over; that the trains were in motion going over the work; that they dug an open trench down from the rails about 15 feet wide. At the time of the accident they were down approximately 12 feet below the base of the rails. Before they got down there they had shored everything—had shored the trestle down at a point four feet below the stringers; shored the banks outside of the line of piles. He testified further that the cave-in occurred from underneath the bottom end of the planking; it occurred at a point about five or six feet above the bottom of the excavation. When the accident occurred he investigated to see how much dirt had come down from the bank, and found that approximately a lump perhaps two feet in length had come down. It fell out from up inside under the end of the planking. He determined the amount of the earth that was underneath the planking. He had to look up underneath the planking to see the hole. The material and the bulkheading were still there; they did not fall. The foreman also testified that Paegles, Stukie, and a helper by the name of Guiles did the shoring.

Paegles testified that he put the shoring in and secured the banks. He did it with the assistance of Stukie. He says the shoring extended down to five feet from the bottom of the excavation where the accident happened. The sheathing or planking consisted of boards 2 inches thick by 12 inches wide and 5 feet long. There were five on the side where the man was hurt, five straight up and down, and two across, and a telegraph pole from that bank to the other one. The telegraph pole was the shore, and the planks that were put up against the sides of the bank itself were called "lagging." He says this was done five days before the happening of the accident to the plaintiff; that the earth that struck the plaintiff fell from a point between five and six feet above the bottom of the cut. It came from the end of the shoring, and about five or six feet from where plaintiff was standing. The earth fell from right underneath the planks. It fell right out of the bottom. It came from underneath the edges right close to the last plank. This witness testified that he and another man put in this lagging; that they were the men under the foreman whose business it was to put in the lagging when necessary. They put in all the lagging that they were directed by the foreman to put in.

Stukie testified that planking had been put up three days before the accident by himself, Peagles, and some helpers. He says he told Edgecombe he thought it needed it, and Edgecombe said: "Yes, put it up." At the time of the accident this piling or lagging came between five and six feet from the bottom of the excavation. The lagging was kept in place against the planking by two high planks crosswise of the perpendicular planking and a shore across to the opposite bank. He commenced timbering when they started to excavate, and they timbered as they went down.

W. A. Frye testified, on behalf of the defendant, that he was a laborer employed by the defendant company, worked under Edgecombe, had been working as a member of that gang for a little over a year; that whenever they would finish the upper portion of a cut they would put lagging on it, and they kept lagging the finished portions of it until they got down to a point within about five feet of the bottom. It was not finished, but was lagged

within five or six feet of the bottom. It was finished so far as their work was concerned.

The testimony of Edgecombe as to whether the timbering had been finished down to the point between five and six feet from the bottom of the cut was as follows: "Mr. Schlesinger: Q. I understand, Mr. Edgecombe, that this place was shored, according to your testimony, from the point marked 'rails' to a point within five feet of the bottom of the excavation? A. Between 5 and 6 feet; yes, sir. Q. That is, whenever you finished a portion of it, that portion which was finished, you shored up; is that right? A. You are talking now about the trestlework? Q. I am talking now about the embankment; did you shore it up as you finished it? A. The embankment was shored up; yes, sir. Q. As you finished it? A. Yes, sir. Q. You did not shore below the six-foot point, or the five-foot point, because it was not finished? A. Not at the time of the accident. Q. But up to the time of the accident it was finished up to within a point of 5 or 6 feet? A. The shoring was complete within a point of 5 or 6 feet at the bottom of the excavation. Q. That is, that part was finished? A. That was all excavated and dug out; yes, sir. Q. That is, that part was finished and shored up, was it? A. Shored up; yes sir. Q. And finished. That is all."

The plaintiff had been at work in the bottom of this cut shoveling dirt about 10 or 15 minutes when the south bank of the cut underneath the bottom end of the planking caved in, and a quantity of earth fell on him throwing him to the ground. A second caving of the earth from the same place immediately followed, which fell upon plaintiff's right leg and broke it, producing a compound comminuted fracture. On the day following the injury plaintiff was removed to the railroad hospital in San Francisco, and remained there for nearly seven months. The next day after arriving at the hospital he was operated on for the purpose of removing the broken pieces of bone. He underwent three operations in all while in the hospital. After recovering sufficiently to use the injured leg, it was found to be about half an inch shorter than the other.

This injury to the plaintiff is the cause of action against the defendant. The testimony, as has been stated, is to the effect that the earth which fell upon the plaintiff and injured him came from underneath the bottom end of the planking at a point about five or six feet above the bottom of the excavation. Upon this testimony the court instructed the jury to find for the defendant, upon the claim made by the defendant that the evidence showed that sufficient and adequate material was furnished the employés; that the material was to be adjusted and put in place by the employés as the work progressed, and as it should be deemed necessary for their own safety to do so; that the place where this work was being carried on and in which the plaintiff was being employed was not such a one as is contemplated by the law requiring that the master shall furnish a safe place for the servant to work in.

Bert Schlesinger, for appellant.

A. A. Moore and Stanley Moore, for respondent.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The controversy in this case turns upon the question whether the rule requiring the master to furnish the servant a reasonably safe place in which to work is applicable to the facts of this case. In determining the question upon the instructions of the court, the plaintiff is entitled to the benefit of all the inferences in his favor which the jury could have been justified in drawing from the testimony. Pleasants v. Fant, 22 Wall. 116, 122, 22 L. Ed. 780.

The plaintiff, at the time of the accident, was 20 years of age. He

had never before worked in cuts or excavations. He knew nothing about that kind of work. He was not warned that there was any danger in the place where he was set to work, and he apprehended none. So far as he made a place for himself in shoveling the dirt from the bottom of the cut there was no danger, and he was not injured by reason of any weakness of the bank produced by his work. He was injured by the falling of the earth from behind the timbers, and not from the untimbered bank. To see the place from which the earth fell it was necessary to look up and underneath the planks. The plaintiff had nothing to do with the work of timbering this embankment. That was in charge of other workmen assigned particularly to that work, and it had been completed some days, down to the point where it stood on the day of the accident. The foreman evidently knew that as the work of shoveling out the cut proceeded the embankment would become dangerous to the laborers in the cut, and he undertook to make the place safe for them by setting men to work timbering the embankment. The fair inference is that the timbering was either not carried low enough or failed to make the bank secure as far as it did go, for the bank caved and the plaintiff was injured. The plaintiff did not know of the danger arising from the fact that the earth might fall from behind the timbers, and the danger was not so obvious that he could be presumed to have known of it.

In the case of Union Pacific Ry. Co. v. Jarvi, in the Circuit Court of Appeals for the Eighth Circuit, 53 Fed. 66, 3 C. C. A. 433, the plaintiff was at work in a coal mine digging coal, which was removed by cars furnished him on each day. On the day of the injury to plaintiff, which was the subject of the action, there were no cars at the place where he was working. He accordingly walked along a passageway in the mine to get a car, and was struck by a stone that fell from the roof of the passageway, which injured him. At the conclusion of the testimony defendant requested the court to instruct the jury to return a verdict in its favor. The request was denied, and this action of the court was assigned as error in the Circuit Court of Appeals. Judge Sanborn, in discussing the duty of the employer in that case, said:

"It is the duty of the employer to exercise ordinary care to provide a reasonably safe place in which his employé may perform his service. It is his duty to use diligence to keep this place in a reasonably safe condition, so that his servant may not be exposed to unnecessary and unreasonable risks. The care and diligence required of the master is such as a reasonably prudent man would exercise under like circumstances in order to protect his servants from injury. It must be commensurate with the character of the service required, and with the dangers that a reasonably prudent man would apprehend under the circumstances of each particular case. Obviously, a far higher degree of care and diligence is demanded of the master who places his servant at work digging coal beneath overhanging masses of rock and earth in a mine than of him who places his employé on the surface of the earth, where danger from superincumbent masses is not to be apprehended. A reasonably prudent man would exercise greater care and watchfulness in the former than in the latter case, and, throughout all the varied occupations of mankind, the greater the danger that a reasonably intelligent and prudent man would apprehend, the higher is the degree of care and diligence

the law requires of the master in the protection of the servant. For a failure to exercise this care, resulting in the injury of the employé, the employer is liable; and this duty and liability extend, not only to the unreasonable and unnecessary risks that are known to the employer, but to such as a reasonably prudent man in the exercise of ordinary diligence—diligence proportionate to the occasion—would have known and apprehended. * * * While the master is not a guarantor or insurer of the safety of the place in which he puts his servant, or of the safety of the tools or machinery he furnishes, he is in every case bound to exercise that care and diligence proportionate to the occupation and the occasion which a reasonably intelligent and prudent man would use under like circumstances both to provide and keep in reasonably safe condition the place of work and the machinery and appliances requisite to its performance. This duty is personal to the master, and cannot be so delegated as to relieve him of liability. * * * Of the master is required a care and diligence in the preparation and subsequent inspection of such a place as a room in a mine that is not, in the first instance, demanded of the servant. The former must watch, inspect, and care for the slopes through which and in which the servants work as a person charged with the duty of keeping them reasonably safe would do. The latter has a right to presume, when directed to work in a particular place, that the master has performed his duty, and to proceed with his work in reliance upon this assumption, unless a reasonably prudent and intelligent man in the performance of his work as a miner would have learned facts from which he would have apprehended danger to himself."

The testimony was conflicting as to the place and cause of the injury. The court, after referring to some of the features of the testimony, said:

"In view of this testimony it certainly was a fair question for the jury whether or not the defendant's failure to protect this particular portion of the roof by timbers or to remove it by blasting was not a lack of ordinary care."

In the case of Kelley v. Fourth of July M. Co., 16 Mont. 484, 496, 41 Pac. 273, 275, the court states the case and the law applicable thereto as follows:

"The evidence in this case is that the plaintiff was employed, at the time of the accident, in running a tunnel in defendant's mine. He was doing this work under the immediate supervision and direction of John Sheehan, the foreman and manager of the mine. Sheehan was not working in the mine with the plaintiff. The plaintiff was not engaged in creating a place, on his own judgment, and at his own risk. He assumed the risks naturally attendant upon driving the tunnel. It was the duty of the defendant to keep that part of the tunnel or place already created safe, by whatever reasonable means were necessary. If the plaintiff had been injured while in the actual work of drilling or blasting in the face of the tunnel he was driving, he may have had no claim on the defendant for damages; for these were risks he assumed as a miner. But he did not assume the risk of defendant's failure to keep that part of the tunnel or place already created reasonably safe and secure. For instance, if a stone or material blasted or dug from the tunnel by plaintiff should have been blown against, or should have fallen upon, him, he would have had no remedy against defendant for any injury sustained thereby. This is a risk belonging to his employment, and which he assumed. But he did not, by his employment as a miner in driving the tunnel, assume the risk of the failure of the defendant to take such reasonable precautions as were requisite to prevent the caving and falling of the roof of that part of the tunnel already created upon him, while engaged in his work. Nor did he assume the risk of the failure of the defendant to keep the floor of the tunnel so free from rock and débris as not to materially hinder or obstruct his escape from his place of work, in case of accident, such as occurred in this case, or might occur by premature or unexpected explo-

sions of the dangerous materials he was using in his work. He assumed the risks incident to the work in front of him, and not the risks of defendant's failure to properly care for that part of the tunnel or place behind him which he had completed and turned over to the care and control of the defendant."

The court then refers to Union Pacific Ry. Co. v. Jarvi, supra, as collating a large number of authorities and containing an able and exhaustive discussion of the law governing that class of cases, and concludes with the opinion that the defendant in the case was guilty of negligence in not sufficiently timbering the tunnel where plaintiff was at work and received his injuries, and in not procuring competent timbermen to do the work. It is not necessary to go that far in the present case. We are here simply called upon to determine whether the reasonable sufficiency of the timbering of the embankment for the safety of the workmen employed in the cut below was a question for the jury.

In Mather v. Rillston, 156 U. S. 391, 399, 15 Sup. Ct. 464, 467, 39 L. Ed. 464, the Supreme Court of the United States had occasion to state the general principle applicable to cases of this character. The court said:

"If an occupation attended with danger can be prosecuted by proper precautions without fatal results, such precautions must be taken by the promoters of the pursuit or employers of laborers thereon. Liability for injuries following a disregard of such precautions will otherwise be incurred, and this fact should not be lost sight of. So, too, if persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers and suffer in consequence, the employers will also be chargeable for the injuries sustained. Both of these positions should be borne constantly in mind by those who engage laborers or agents in dangerous occupations, and by the laborers themselves as reminders of the duty owing to them. These two conditions of liability of parties employing laborers in hazardous occupations are of the highest importance, and should be in all cases strictly enforced."

The authorities upon this question are numerous, presenting it in the various phases of employment; but we think the cases cited sufficient to show that upon the facts in the present case the court should have submitted to the jury, under proper instruction, the question whether the defendant had provided a reasonably safe place in which the plaintiff was required to work.

The judgment of the Circuit Court is therefore reversed, with instructions to grant a new trial.